**Control Board of the Harrisburg School District v. Board of School Directors of the Harrisburg School District**

540

C.P. of Dauphin County, no. 2006 CV 2489.

*Brian P. Gabriel,* for plaintiffs.
*Carl P. Beard,* for defendants.

CLARK, *J.,* June 27, 2006—

## INTRODUCTION

In order to properly discuss this case, the court must briefly set forth the general historical background of school districts in this Commonwealth, and then con-

trast and compare a "normal" school district with one governed by The Education Empowerment Act (EEA) of 2000, Act of May 10, 2000, P.L. 44, no. 16, §8.1, as amended 24 P.S. §§17-1701-B—17-1716-B, which statute will be discussed at length herein.

Initially, we begin this discussion with acknowledging that the General Assembly has created approximately 500 school districts in this Commonwealth, which districts are for the most part autonomous, and charged with carrying out the General Assembly's responsibility to implement public education in Pennsylvania. These school districts were governed by boards of school directors who are imbued, inter aila, with full taxing power (which is only limited in certain distressed situations, by other legislative enactments), and are permitted to decide the method and manner to spend their tax proceeds for the general purpose of public education in their respective school districts, subject to certain legislative and regulatory requirements and restrictions.

However, it is critical to understand that these school districts and their respective school boards have no inherent, original authority, powers or prerogatives of their own. A school district is a political entity created by the General Assembly, indeed a legislative act of the Sovereign itself, by and through the independent legislative branch of state government. Any and all power vested in a school district comes to it by virtue of statutes enacted by the General Assembly, pursuant to Article III, Section 14 of the Pennsylvania Constitution. This prime constitutional mandate provides, "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve

the needs of the Commonwealth." Pennsylvania Constitution Article III, Section 14.

Thus, it is indisputable and therefore beyond the cavil of legal challenge, that the General Assembly indeed has total legislative control over public education including the manner and method of its implementation in this Commonwealth. Unfortunately, the political realization and acceptance of this most fundamental of constitutional concepts appears to be at the root of at least some of the discord which now plagues the Harrisburg School District, as illustrated by the numerous contentious issues which have been presented to our court for resolution. It is truly unfortunate that the parties, or at least some of them, are unwilling and/or unable to fully acknowledge and understand the situation that now prevails in the school district by virtue of the operation of law in this case. Regrettably, we must begin by stating the obvious to the parties, namely, to wit: in the final analysis, it does not matter if individuals affected by the General Assembly's statutory enactments agree or disagree with said laws—they are the laws, and must be obeyed and fulfilled by every citizen. Further, we are likewise compelled to state another obvious legal axiom in this case, that is: whatever authority, power or prerogative that the General Assembly may grant to a school district by legislative enactment, it (General Assembly) can just as easily modify, condition or even revoke.

The initial instance of legislative limitations upon school districts, and the concomitant modification, conditioning or revocation of the substantial authority, powers, and prerogatives normally granted to a school district and its elected board of school directors, is found in

Act no. 675 of December 15, 1959, amending the Act of March 10, 1949 (P.L. 30), relating to public education in this Commonwealth, 24 P.S. §6-691 et seq. This statute was originally created to reform and assist school boards that were in a severe state of fiscal crisis, with a resultant situation where the school district became so financially "distressed" that it created an intolerable burden upon the citizen taxpayers of such district, while at the same time usually failing to deliver the requisite levels of needed education for the children of the district. This particular statute provided for the revocation of the authority, powers and prerogatives of an elected school board in such a district, and placed those powers, authority and prerogatives in the hands of a specially created body, known as a Special Board of Control.

Similarly, and of more recent vintage, the General Assembly also enacted another statute to reform academically distressed school districts. This legislation is commonly known as the Education Empowerment Act (EEA), *supra*. This Act was created to reform and assist school districts that were distressed in certain other ways, primarily ones who were in substantial or acute academic distress, and also provided some relief for financial distress issues as well.

The EEA distinguishes between two types of academically distressed school districts. The first type of academically distressed district is one that may be described as a substantially distressed district with a "history of low test performance." This type of academic distress qualification is met when 50 percent of the students in the district score below the basic level of performance on standardized math and reading tests for the most recent two years for which the scores are available. 24 P.S. §17-1702-B.

The second type of academically distressed school district may be described as an acutely distressed district. This type of district is defined as having a "history of extraordinarily low test performance." This classification is deemed to have occurred when 60 percent or more of the students in the district score below the basic level of performance on standardized math and reading tests for the most recent two years for which the scores are available. 24 P.S. §17-1702-B. The Harrisburg School District is presently in a posture where it may be properly classified as an acutely distressed district, and it (school district) is therefore subject to the most severe remedial measures mandated by the EEA.

Under the EEA, at section 17-1707-B(a.1), an acutely distressed district is declared to be an "Empowerment District" if the following special conditions are met: (1) The city in which the school district is located is "a city of the third class that has opted under the 'Optional Third Class Charter Law' or 53 Pa.C.S. pt. III, subpt. E, to be governed by a mayor-council form of government and which has a population in excess of 45,000," *id.;* and, (2) the school district is a "school district of the second class which has a history of extraordinarily low test performance." *Id.* (As defined above.)

If a school district meets these acute distress qualifications under section 17-1707-B, then the Secretary of Education of the Commonwealth is required to "immediately certify the school district as an education empowerment district" (*i.e.,* declare that the full provisions of the EEA are now applicable to that school district). *Id.* Therefore, as soon as a school district qualifies under section 17-1707-B, the secretary, by virtue of the man-

dates of the EEA, is required to immediately transform said school district into an empowerment district.

Once the Secretary of Education has declared that a school district is an empowerment district subject to the EEA, the mayor of the city in which the school district is located must appoint five residents of the school district to serve on a board of control. Section 17-1707-B(b). The mayor does not have the discretion to refuse to appoint the control board. The statute is clear that the control board "*shall* be appointed by the mayor . . . within 14 days of the certification of the school district as an education empowerment district." *Id.* (emphasis added) However, the mayor does have discretion to decide which persons he wants to appoint or dismiss from the control board. The statute specifically provides that, "Members of the board of control shall serve at the pleasure of the mayor." *Id.*

Essentially, the control board is given the total authority, power and prerogative by the EEA to administer and operate the school district in the stead of the elected board. 24 P.S. §17-1707-B(C). One of the primary objectives of this interim opinion will be to more precisely define the authority, powers and prerogatives of both the control board and the elected board in the school district, when operating under the provisions of the EEA. The scope of this interim writing will be limited to a discussion and determination of those critical issues which must be addressed and resolved before the end of the current school district fiscal year, June 30, 2006. A more comprehensive and final opinion will be issued in due course to comprehensively address all of the issues presented in this matter.

Unfortunately, the school district was (and apparently still is) an acutely distressed district. As a result, and as

required by the mandatory provisions of the EEA, on December 19, 2000, the Honorable Stephen R. Reed, mayor of the City of Harrisburg, appointed a control board to manage and operate the school district. It is undisputed by the parties that the school district met the criteria for an acutely distressed district under the EEA at the time Mayor Reed appointed the control board.

Despite the appointment of the control board, it is likewise important to note that the elected Board of School Directors of the Harrisburg School District has not been abolished by the EEA or any other statute. In fact, under 24 P.S. §17-1706-B, the specific power to levy taxes to support the operation of the school districts in such situations has been exclusively withheld from the boards of control and remains with elected school boards. This is presumably to comply with the specific provisions of the Pennsylvania Constitution which require that only elected officials may levy taxes. Pennsylvania Constitution Article III, Section 31. Nevertheless, it is quite clear that the control boards, and not the elected boards, are intended to actually administer and operate empowerment districts under the provisions of the EEA.

Since the EEA wrested power away from the elected board and vested it with the control board, it was not surprising that the elected board has previously challenged the constitutionality of the EEA on several occasions. Although the case-law history of the EEA is a bit complicated, we will attempt to summarize it herein, albeit briefly.

When the EEA was first passed by the General Assembly on May 10, 2000, the school district initiated a legal challenge to that statute in Commonwealth Court,

and also filed a motion with that court asking for a preliminary injunction to enjoin its (EEA) implementation. The motion for injunction was granted by order dated June 30, 2000, because, at that time, the provisions of the EEA relating to acutely distressed districts applied to no city other than the City of Harrisburg. The Commonwealth Court considered this to be "special legislation" in violation of Article III, Section 32 of the Pennsylvania Constitution. This injunctive relief was affirmed on appeal by the Pennsylvania Supreme Court in *Harrisburg School District v. Hickok,* 563 Pa. 391, 761 A.2d 1132 (2000) *(Hickok I).*

Subsequently, on November 22, 2000, the Pennsylvania General Assembly amended the EEA to allow the provisions for acutely distressed districts to be applicable to other cities besides Harrisburg. This statute was again challenged by the elected board on numerous grounds. The Commonwealth then filed preliminary objections to the school district's complaint. The Commonwealth Court denied certain preliminary objections and found that the EEA was again unconstitutional in *Harrisburg School District v. Hickok,* 781 A.2d 221, (Pa. Commw. 2001) *(Hickok II).*

Based upon the Commonwealth Court's rulings in *Hickok II,* the school district filed a motion for judgment on the pleadings against the Secretary of Education, Charles B. Zogby. The Commonwealth Court affirmed its preliminary rulings in *Hickok II,* in the case of *Harrisburg School District v. Zogby,* 789 A.2d 797 (Pa. Commw. 2002). This time, however, the legality of the amended EEA was subsequently upheld by the Pennsylvania Supreme Court, which reversed the holding of the

Commonwealth Court and found the EEA to be constitutional in *Harrisburg School District v. Zogby,* 574 Pa. 121, 828 A.2d 1079 (2003).

And now, the control board files the instant lawsuit against the elected board claiming that the elected board has violated various provisions of the EEA. The control board has filed with the court the following actions: An action in quo warranto for the court to remove certain members of the elected board who allegedly were improperly appointed without the approval of the control board; an application for a writ of peremptory mandamus or, in the alternative, an application for the issuance of a preliminary injunction to compel the elected board to pass the 2006/2007 school tax levy and affirm certain other debts from a pending loan with Sovereign Bank; to issue a declaratory judgment establishing the authority, powers and prerogatives of the parties under the EEA; and finally, an action in equity to remove the entire elected board from public office for nonfeasance if they do not pass said tax levy and affirm said bank debt. We also note that defendants have filed various counterclaims to the averments in the complaint, amended complaint, and the various motions, petitions and applications for relief.

Due to the exigency of this case, in that the school tax levy and Sovereign Bank debt issues must be resolved before midnight on June 30, 2006, we will only address the quo warranto, mandamus, request for injunctive relief, and so much of the declaratory judgment action issues as are necessary to provide the parties with instruction and direction sufficient to enable them to fulfill their respective rights and responsibilities before the expiration of the current fiscal year for the school district. As

stated earlier, we will issue a full, formal opinion concerning all of the matters submitted to us for resolution in a forthcoming writing.

## PROCEDURAL HISTORY

This action was originally presented to the court when the control board filed its complaint in equity, in mandamus, for declaratory relief and an action in quo warranto (original complaint), on June 8, 2006. On June 9, 2006, the control board filed an emergency petition for a preliminary injunction and motion for peremptory mandamus. On the morning of June 15, 2006, the court held a status conference with the attorneys in this matter and later that day, the court filed an order scheduling briefs and a hearing. However, at the request of the parties who were attempting to possibly settle this matter, the court agreed to enter an amended briefing order and a rule to show cause on June 16, 2006. The amended briefing order scheduled a hearing on the merits of this case for June 27, 2006. The rule to show cause also scheduled a hearing for June 29, 2006, to consider the request of the control board to remove the elected board should that board (elected board) refuse to adopt a tax levy to fully fund the school district's 2006/2007 budget. Thereafter, on June 20, 2006, the control board filed an amended complaint and an amended emergency petition for preliminary injunction and motion for peremptory mandamus.

On June 21, 2006, the defendants filed their answer to the original complaint. On June 23, 2006, both parties filed their original briefs and the defendants filed their answer to the amended complaint and amended emer-

gency petition for preliminary injunction and motion for peremptory mandamus. The plaintiffs also filed on that day their reply to new matter and answer to counterclaims of the defendants. The court also filed an amended order to explain what issues would be entertained at the June 27, 2006 hearing. On June 26, 2006, the plaintiffs filed their rebuttal brief and the defendants electronically sent their brief to the court on that date, to be subsequently and formally docketed on June 27, 2006. The hearing scheduled for June 27, 2006, occurred as scheduled, and this writing is a product of that proceeding.

## ISSUES

The control board requests the following partial relief as summarized by the court:

(1) The three most recently appointed members of the school board should be removed through the quo warranto action because the school board had no authority to appoint them.

(2) Plaintiffs set forth a valid claim for a writ of mandamus and/or a preliminary injunction ordering the school board to perform its mandatory duties.

## DISCUSSION

### (1) *The Three Most Recently Appointed Members of the School Board Should Be Removed Through the Quo Warranto Action Because the School Board Had No Authority To Appoint Them*

In our background discussion, we have explained how a control board comes into existence. We must now am-

plify that discussion to delineate what authority, powers and prerogatives are granted to control boards under the EEA. As mentioned above, the control board in this case was appointed pursuant to the acutely distressed provision of the EEA, 24 P.S. §17-1707-B. This statute grants boards of control the following powers:

"The authority granted to a board of school directors under section 1704-B(a) shall be exercised by the board of control of an education empowerment district certified under this section. The provisions of sections 1705-B(c), (d), (e) and (g), 1706-B and 1708-B(a) shall be applicable to a board of control appointed under subsection (b). The provisions of sections 693, 694, and 695 relating to special boards of control shall apply to a board of control under this section." 24 P.S. §1707-B(c). All statutes are in title 24 and their complete citations are: section 17-1704-B, section 17-1705-B, section 17-1706-B, section 6-693, section 6-694, and section 6-695.

We will now analyze the authority, powers and prerogatives that are granted to a control board. To accomplish this analysis, we will compare the different statutes that confer those very powers, authority and prerogatives. Section 1706-B states in pertinent part,

"Except for the power to levy taxes, the board of control may exercise all other powers and duties conferred by law on the board of school directors and the powers and duties conferred by law on a special board of control under sections 693, 694, and 695." 24 P.S. §17-1706-B(a).

Therefore, a control board is granted *all* the powers that an elected board has except for the power to levy taxes. The important thing to note in this particular statute is that it does not take away any of the authority,

powers and prerogatives of the elected board. Further, it says the control board "may" exercise the elected board's power. This specific statutory language would seem to imply, when viewed in a vacuum, that until the control board decides to exercise any or all of this authority, power or prerogative, that the elected board retains those same powers, and is free to act pursuant to them. However, this statute also incorporates sections 693, 694 and 695, *supra,* and it is those provisions that give clarity and full meaning to the intent of the General Assembly in enacting the EEA.

Section 1706 must be read together with section 693. Section 693 states,

"When the special board of control assumes control of a distressed school district, it shall have power and is hereby authorized to exercise all the rights, powers, privileges, prerogatives and duties imposed or conferred by law on the board of school directors of the distressed district, *and the board of school directors shall have no power to act without the approval of the special board of control. . . .*" 24 P.S. §6-6903. (emphasis added)

Unlike the permissive language of section 1706, the full language of section 693 affirmatively and conclusively divests the elected board of all power to act without the approval of the control board.

The elected board attempts to argue that when the General Assembly enacted the EEA, and thereby granted the control board the powers enumerated in section 693, it (General Assembly) did not mean to include that portion of section 693 which divests the elected board of all power, except the power to levy taxes. The elected board appears to suppose that the reason the limitation of the

elected board's powers was not divested is allegedly because those powers were only necessary when a school district is financially distressed, not acutely academically distressed.

We find no merit to the defendants' argument on this critical issue. Indeed, to accept the position of the elected board on this fundamental issue is to endorse the concept that the General Assembly intended to create "two captains of the ship." Such a construction and interpretation would result in a continuous battle for control between the elected board and the control board. It must be remembered that the triggering conditions for designation as an acutely distressed district came into play because the predecessor elected board, for whatever reason(s), was unable to provide the necessary leadership and control in the school district to avoid the dire academic situation which necessitated the creation of a control board. It would be bordering upon the absurd to construe these statutes to still empower the elected board to have any authority, power and prerogatives over the administration and operation of the school district in such a situation. We find that as a matter of law, sections 1706 and 1707 clearly give *all* the powers of sections 693, 694 and 695 to the control board. We see no reason to exclude any of the provisions of sections 693, 694 or 695 from the sweeping grant of authority, power and prerogatives vested in the control board. Further, we also find that when the statute limits the powers of the elected board, such limitation, by definition, is a grant of those same powers to the control board. Finally, we also see no reason or logic to distinguish between financially distressed or acutely academically distressed school districts. Both require a control board that has broad, sweeping

authority, powers and prerogatives to reform an ailing school district.

Therefore, with regard to acutely distressed districts under the EEA, we find as a matter of law that the inclusion of section 693 means that as soon as the control board was created, it automatically divested the elected board of all its authority, powers and prerogatives, save the power to levy taxes, which was specifically exempted in section 1706. Thereafter, the elected board can do no act unless such act is approved by the control board. To put it another way, if an elected board attempts to perform an act that was not approved by the control board, that act is deemed to be ultra vires, and therefore, void ab initio. This is because the elected board had no actual authority, power or prerogative to act at the time it purports to act. We recognize that this holding may be disconcerting to some people, but we are constrained to clearly acknowledge that it is firmly within the power of the General Assembly to divest an elected board of any or all of its authority, power and prerogatives, as the General Assembly deems appropriate and necessary to effect the implementation of public education in this Commonwealth.

We also find that section 693 does not contradict section 1706. When section 1706 states that the control board "may" exercise the powers of the elected board, it merely means that the control board is not required to exercise all of its powers. However, under section 693, those powers are automatically and totally transferred to the control board.

We note that there is no limitation on the word "act" as utilized in section 693. As a result, we find that ap-

pointing a person to a vacant position as a member of the elected board is an "act" within the meaning of section 693.

The plaintiffs in the case at bar claim that the members of the elected board had no authority and/or power to appoint three persons to fill vacancies on the elected board without the approval of the control board. The plaintiffs claim that since the elected board did not have *prior* approval, those appointments are likewise void ab initio.

However, section 693 states, "the board of school directors shall have no power to act without the *approval* of the special board of control." *Id.* (emphasis added) We note that the word used by the legislature in section 693 is "approval," and does not have a modifier such as "prior." We find that the word "approve" can be satisfied de facto, or tacitly (as opposed to a word such as "authorize," which would require affirmative and official action). Therefore, we must analyze the facts to determine if the control board de facto approved, tacitly approved or otherwise approved, the elected board's appointments by action and/or implication.

The facts concerning this critical matter were developed at the hearing and indicated, inter alia, that the control board never attempted to appoint persons to fill the vacancies on the elected board. It is abundantly clear that at all times pertinent to the actual appointment process, the school district's superintendent was under the impression that it was quite proper and legal for the elected board members to appoint persons to fill the vacancies on their board. It was not until later in the spring of 2006 that the superintendent made further inquires from vari-

ous legal sources as to whether or not the appointment actions of the elected board were legally authorized.

In early April of 2006 (and at least a week prior to the elected board's public meeting on April 24, 2006), in response to a request by the superintendent to confirm certain information that the superintendent had received from these "other" legal sources concerning the appointment actions of the elected board, the school district solicitor issued a current opinion concerning these matters. The solicitor did, indeed, confirm that the control board has exclusive power to appoint persons to fill vacancies in the elected board. It was also at or about that same time that the solicitor informed the superintendent and the control board that he had previously issued a similar opinion on such matter, under date of January 9, 2001, to the then-president of the elected board, Ms. Wanda Williams.

Thereafter, the superintendent and control board sought outside special legal counsel concerning such matters, and decided to institute the current legal proceedings that are now pending before this court. It also appears that at no time prior to the institution of the current lawsuit did the superintendent, control board, solicitor or any other representative of those parties ever contact any member of the elected board with regard to the issues raised in the quo warranto action now at issue. However, of critical importance to the ultimate resolution of this matter is the undeniable fact that, notwithstanding the knowledge and belief of the superintendent and control board members that the three appointed members of the elected board may not have any legal authority to hold such positions, and notwithstanding the fact that significant preparations

were already being undertaken to expel them from office by means of this quo warranto action, the superintendent and control board committed pivotal acts which affected the outcome of this matter. Specifically, the superintendent and control board submitted to the elected board, en banc, several vital financial issues for formal elected board action, at a duly advertised public meeting of the elected board, which meeting was conducted on April 24, 2006, at school district headquarters.

We find that the aforesaid actions of the superintendent and control board, in submitting crucial fiscal matters to the entire elected board, including the three appointed members, knowing that the three appointed members of that elected board may have been illegally holding their offices, is irreconcilable with the position that the plaintiffs now espouse, that there was never an "approval" of their appointments. It is, quite frankly, astonishing that the superintendent and control board would now attempt to remove those appointed members of the elected board for a lack of authority to hold those positions. Additionally, it also appears that the superintendent was willing to have the en banc elected board vote on the tax levy and affirmations of other fiscal obligations for the 2006/2007 school district fiscal year while these present court proceedings were pending. In sum, the plaintiffs cannot now validly assert that the three appointed members of the elected board illegally hold their offices, and at the same time submit critical school district business to that same en banc elected board, including the three disputed members, for official action by that elected board. Therefore, we find that these actions of the superintendent and control board constituted

a de facto approval of the appointment of the three disputed members of the elected board.

However, it is now equally clear that the control board is explicitly exercising its exclusive right to fill future vacancies on the elected board. Therefore, in the future, only the control board can appoint persons to fill vacancies on the elected board, unless the control board explicitly grants that power to the elected board.

### (2) *Plaintiffs Set Forth a Valid Claim for a Writ of Mandamus, and/or a Preliminary Injunction Ordering the School Board To Perform its Mandatory Duties*

A writ of mandamus is an extraordinary writ to be only issued in the most legally and factually compelling circumstances, and where there is no alternative relief that is reasonably possible. It is not intended to be peremptory, notwithstanding the creative nomenclature affixed to the plaintiffs' pleadings in this regard. The court finds that the current situation between the control board and the elected board is not yet ripe for consideration of this remedy, at this time, because any malfeasance or nonfeasance as alleged by the control board has not yet fully and finally occurred. The elected board's final vote on the tax levy is not scheduled to occur until June 28, 2006. Therefore, since the elected board has not yet failed to act appropriately, the court finds it cannot issue a writ of mandamus at this time. We further note that at the hearing conducted this date, the plaintiffs likewise acknowledged that this form of relief may not yet be ripe for disposition. Therefore, we decline to issue any such writ at this time.

Although we have ruled that the control board's request for a writ of mandamus is not ripe, we find that the

court can and should impose a preliminary injunction, due to the exigent nature of the case before the court. We note that in order for there to be public funding of the school district for the 2006/2007 fiscal year, the elected board must pass a resolution for an appropriate tax levy before midnight on June 30, 2006. Without the enactment of such a resolution, there may well be no funding source for the operation of the school district for the 2006/2007 fiscal year. It is likewise necessary for the elected board to pass a resolution affirming the pre-existing debt to Sovereign Bank, before the midnight, June 30, 2006, deadline. Failure to pass these imperative resolutions could have a dire, if not catastrophic impact on the school district.

As mentioned earlier, the plaintiffs are asking for numerous forms of relief. However, due to pressing time constraints, the court has determined that, for purposes of this interim opinion and accompanying decree, it is only feasible to rule on the issues of the quo warranto action, mandamus and injunctive relief concerning the necessary tax levy and the affirmation of the Sovereign Bank loans.

The elected board appears to challenge the right of the control board to seek the court's intervention to force the elected board to pass the tax levy and affirmation of bank loans. However, under section 694, the General Assembly has clearly empowered the control board to require the elected board to pass a tax levy and affirm debts. This section states in relevant part,

"When the operation of a distressed school district has been assumed by the special board of control, the board of school directors of the district *shall,* upon recommen-

dation and with the approval of the special board of control, levy an additional tax or taxes sufficient to liquidate the indebtedness of the district. . . ." 24 P.S. §6-694. (emphasis added)

This language clearly establishes that the elected board must raise a tax when the control board recommends it. We also note that the rest of section 694 grants the control board authority to petition the court of common pleas to issue a writ of mandamus to force the elected board to pass an additional tax.

Although there is no tax increase for the 2006/2007 school district fiscal year in the case at bar, we find that if the elected board can be compelled to pass an additional tax, it can certainly be compelled to pass its regular tax levy. This is especially true because the elected board has an independent duty to pass tax levies to fund the school district. 24 P.S. §6-601.

Aside from section 694, we also note the general provision listed in section 695. We recognize that statutes are sometimes difficult to interpret. Therefore, for the purposes of clarity, we will quote the entire section, but emphasize the critical portions thereof. This section states,

"*The school directors* of a distressed district may not resign their offices, except with the unanimous consent of the special board of control and shall continue in office, unless removed from office for neglect of duty under the provisions of section 318 of this Act by the court of common pleas of the county in which such district or the largest part in area is located, or unless any of such directors are elected to another position not compatible with the position of school director or are appointed to

any position for which there is a requirement that said appointee shall hold no elective office, for the remainder of their terms during the time the district is operated by the special board of control and *shall perform any duties delegated to them by it.* The assumption of control of a distressed school district by the special board of control shall in no way interfere with the regular election or reelection of school directors for the district." 24 P.S. §6-695. (emphasis added)

A careful reading of this statute clearly indicates that interlaced within other language concerning how an elected school director might be allowed to lawfully leave office, is the simple, yet powerful directive, "[the elected school directors] shall perform any duties delegated to them [elected school directors] by it [control board]." *Id.* Thus, the control board's authority is clear. The members of the elected board must authorize whatever tax the control board directs them to levy and otherwise satisfy the other fiscal obligations of the school district.

Finally, as mentioned above, under section 693, as soon as a control board is created, the elected board loses all its authority, powers and prerogatives, save the power to levy taxes. Therefore, as also mentioned earlier, the elected board does not have the authority, power or prerogative to contest the control board's budget and must fund said budget, notwithstanding any objections they (elected board) may have to its content or amount. Section 693 explicitly states, "the special board of control may require the [elected] board . . . to increase tax levies in such amounts and at such times as is permitted by the act to which this is an amendment." 24 P.S. 693(2).

The defendants claim that if the control board can force the elected board to raise taxes, then it is actually the control board who has the power to raise the taxes. The defendants claim that allowing an appointed board to raise taxes is a violation of the Pennsylvania Constitution, Article III, Section 31. Therefore, the defendants are raising a constitutional challenge to this aspect of the EEA.

The defendants also note that the EEA itself specifically withholds the power to levy taxes from the control board in section 1706. The defendant claims, "To argue that the legislature gave the board of control all powers except the power to levy taxes, and then to argue that the legislature intended that the board of control could dictate how the elected board of directors levies taxes would be absurd." Defendants' brief p. 20 The defendants then note that under the Statutory Construction Act, "it must be presumed that the General Assembly did not intend a result that was absurd or unreasonable." *Id.,* citing to 1 Pa.C.S. §1922(1).

However, what the defendants fail to recognize is that it would be truly absurd for the General Assembly to appoint, as we mentioned earlier, "two captains of a ship." We fail to believe that the General Assembly created one board to have all power to administer and operate a school district and another board to have control over all of the finances. That is a recipe for discord and disaster, as the case at bar clearly evidences.

We further note that the Commonwealth Court in *Hickok II, supra,* has affirmed the constitutionality of the EEA's tax provisions. While the Pennsylvania Supreme Court has not definitively affirmed *Hickok II's*

analysis, we will not speculate that the Supreme Court's opinion would be to the contrary to the holding of the Commonwealth Court. Consequently, we will uphold the established legal precedent of our Commonwealth Court on this issue.

Therefore, we find that the control board is the sole entity with the authority, power and prerogatives to decide all issues pertaining to the administration and operation of the school district, particularly including a determination of all matters relating to the financial needs of the district, and the adoption of a budget to reflect those fiscal decisions by the control board. Thus, the elected board, as a matter of law, is left in the legally unenviable position of having to pass a tax levy and affirm school district debts which it (elected board) had no say in preparing or adopting. We certainly can understand that this may be a distasteful situation for some or all of the members of the elected board to accept. However, in the final analysis, this is precisely the hand that the elected board has been dealt by the General Assembly under the provisions of the EEA. Most likely, one of the primary reasons that the General Assembly did not disband the elected board altogether in situations such as these presented under the EEA was to comply, as best as possible, with the constitutional provision requiring that taxes be levied by elected officials. Hopefully, and more importantly, another reason that the General Assembly did not disband the elected board is because some day the students' test scores will improve to the degree that a control board will no longer be necessary to run the school district and the elected board can once more resume control of the authority, powers and prerogatives normally exercised by an elected board.

The elected board claims that they are entitled to not pass the tax levy because they have not been given "enough information" by the control board. Unfortunately, there is no provision in the Public School Code that entitles an elected board to any special information that is not available to the regular public. If the elected board wishes to inquire of, or even contest, the control board's budget, they are free to attend public meetings and ask questions like any other citizen.

The plaintiffs claim they are entitled to a preliminary injunction to compel the elected board to pass the tax levy and affirm the Sovereign Bank debt. A preliminary injunction should be granted by the court if, inter alia, (1) there is a clear right to relief, (2) the relief is necessary to prevent immediate injury, (3) a remedy at law is inadequate and (4) the injury will restore the parties to the status quo. See *Summit Towne Centre Inc. v. Shoe Show of Rocky Mount Inc.,* 573 Pa. 637, 828 A.2d 995 (2003).

With regard to the first prong of the test for a preliminary injunction, we find that under the law, the elected board is obligated to fulfill its legal duty to pass the tax levy and affirm the Sovereign Bank debt. Our legal analysis above determined that the elected board must act upon the recommendations of the control board. Further, as we previously stated, the elected board has its own independent duty to pass a tax levy to fund the school district. Therefore, we find that the control board has a clear right to relief.

The next prong of the test is that the relief is necessary to prevent immediate harm. This is clearly the case. If the tax levy is not passed, the entire school district will

be unfunded. Further, if the elected board does not acknowledge the Sovereign Bank debt, the school district will be forced to make immediate payments out of funds currently budgeted for other purposes. Therefore, we find that requiring the elected board to fulfill its legal duty to pass these resolutions will indeed prevent immediate harm.

The next issue we must determine is whether there is an adequate remedy at law. Clearly, there is no remedy at law available. If the elected board were to be sued at law, they could clearly not pay the funds required to fund the school district, and therefore equitable relief is appropriate.

The last prong of the test which must be considered is whether or not the issuance of the preliminary injunction will restore the parties to the status quo. We find that the elected board can still argue the esoteric legal issues of the exact status of their powers after the school district has been properly funded for the upcoming school year. Therefore, the elected board will not be prejudiced by being required to fulfill their legal duty to pass the necessary resolutions to enact a school tax levy and affirm the Sovereign Bank debt.

Finally, we note that the elected board and its individual members are not entitled to an automatic supersedeas under Rule 1736(b) of the Pennsylvania Rules of Appellate Procedure. This provision states, "unless otherwise ordered pursuant to this subchapter the taking of an appeal by any party specified in subdivision (a) of this rule shall operate as a supersedeas in favor of such party." Pa.R.A.P. 1736(b). Rule 1736(a) lists the entities

that are entitled to an automatic supersedeas in 1736(b). Among the entities listed in 1736(a) is "any political subdivision." Pa.R.A.P. 1736(a)(2). This would include the elected board and its members.

However, we find that to allow an automatic supersedeas would render moot our opinion regarding the harm occurring to the school district. We point the elected board to *Central Dauphin Education Association v. Central Dauphin School District,* 792 A.2d 691 (Pa. Commw. 2001), 60 D.&C.4th 300 (Dauphin Cty. 2001), for authority that a common pleas court can withdraw the automatic supersedeas of a political subdivision, including a public body such as the elected board.

To prevent the harm accruing daily to the school district, we also invoke Pa.R.A.P. 1737. This rule grants a common pleas court the authority to "require security of a party otherwise exempt from the requirement of filing security." Pa.R.A.P. 1737(1). We will require the elected board and/or its individual members to post a bond in the instant matter should it elect to appeal our decisions herein.

We have likewise met the requirements for invoking the bond requirements under Pa.R.A.P. 1736 because: (1) we are acting at the application of a party (the control board), (2) the elected board has had notice and an opportunity to be heard on this issue, and (3) we believe that proper cause has been shown.

Wherefore, we issue an interim decree, of even date herewith, which accords the following relief:

(1) The request of the plaintiffs, in quo warranto, to remove Ms. Loretta Barbee-Dare, Ms. Kia L. Hansard

and Mr. Karl Singleton from office as members of the elected board is denied;

(2) The request of the plaintiffs for a peremptory writ of mandamus is denied;

(3) The plaintiffs' request for a preliminary injunction is hereby granted. Therefore, the court hereby orders and directs that the individual members of the elected board must fulfill their individual and collective statutory duty, as defined and clarified in this interim opinion, to fund the fiscal obligations of the school district by enacting the necessary resolution(s) to fully fund the 2006/2007 final school district budget as adopted by the control board, and to also enact such necessary resolution(s) as may be required to affirm the Sovereign Bank debt. These required actions by the members of the elected board must be performed and completed on or before June 28, 2006;

(4) We further deny the elected board and its members the right to automatically appeal these rulings at law or equity without posting an appropriate bond. Considering the overwhelming fiscal harm that may occur to the school district if there are protracted appeal proceedings which ultimately prove to be frivolous, the elected board and/or its members must post a bond equal to a substantial portion of the annual school district budget, and in this instance, that sum shall be the full amount of $100,000,000, paid into court through the prothonotary of Dauphin County;

(5) This court specifically retains full jurisdiction over any issues associated with the implementation and/or enforcement of the holdings of this interim opinion and the interim decree issued in conjunction herewith;

(6) The court will issue, in due course, a full opinion and decree concerning all matters and issues which have been submitted to us for resolution.

Issued at Harrisburg, June 27, 2006.

## INTERIM DECREE

And now, to wit, June 27, 2006, after hearing and argument in the above captioned matter and pursuant to the court's opinion of even date herewith, it is hereby declared that:

(1) The request of the plaintiffs, in quo warranto, to remove Ms. Loretta Barbee-Dare, Ms. Kia L. Hansard and Mr. Karl Singleton from office as members of the elected board is denied;

(2) The request of the plaintiffs for a peremptory writ of mandamus is denied;

(3) The plaintiffs' request for a preliminary injunction is hereby granted. Therefore, the court hereby orders and directs that the individual members of the elected board must fulfill their individual and collective statutory duty, as defined and clarified in the interim opinion, of even date herewith, to fund the fiscal obligations of the school district by enacting the necessary resolution(s) to fully fund the 2006/2007 final school district budget as adopted by the control board, and to also enact such necessary resolution(s) as may be required to affirm the Sovereign Bank debt. These required actions by the members of the elected board must be performed and completed on or before June 28, 2006;

(4) We further deny the elected board and its members the right to automatically appeal these rulings at law or

equity without posting an appropriate bond. Considering the overwhelming fiscal harm that may occur to the school district if there are protracted appeal proceedings which ultimately prove to be frivolous, the elected board and/or its members must post a bond equal to a substantial portion of the annual school district budget, and in this instance, that sum shall be the full amount of $100,000,000, paid into court through the prothonotary of Dauphin County;

(5) This court specifically retains full jurisdiction over any issues associated with the implementation and/or enforcement of the holdings of the interim opinion and the directives of this interim decree;

(6) The court will issue, in due course, a full opinion and decree concerning all matters and issues which have been submitted to us for resolution.